SECURITIES AND EXCHANGE COMMISSION, Appellee,

v.

BANNER FUND INTERNATIONAL, et al.

Eddie R. Blackwell, Appellant.

No. 98–5235.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1999.

Decided April 4, 2000.

Afton Jane Izen argued the cause and filed the briefs for appellant.

Mark R. Pennington, Senior Litigation Counsel, Securities & Exchange Commission, argued the cause for appellee. With him on the brief were David M. Becker, Deputy General Counsel, Eric Summergrad, Deputy Solicitor, and Nathan A. Forrester, Attorney Fellow. Jacob H. Stillman, Solicitor, entered an appearance.

Before: GINSBURG and RANDOLPH, Circuit Judges and BUCKLEY, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge GINSBURG.

D.H. GINSBURG, Circuit Judge:

The district court entered a summary judgment against the appellant, Eddie R. Blackwell, and against Lloyd R. Winburn and Swiss Trade & Commerce Trust, Ltd., on the complaint of the Securities and Exchange Commission that the defendants violated the anti-fraud and registration provisions of the securities laws of the United States. The district court enjoined the defendants from committing further violations, and ordered them to disgorge $6.5 million plus prejudgment interest, to provide a sworn accounting of their assets and of financial activities related to the Banner Fund Program, and to repatriate assets received from investors.

On appeal Blackwell argues that: the district court lacks subject matter jurisdiction over the case and personal jurisdiction over him; the district court should have abstained under principles of international comity; he did not violate the securities laws of the United States because the interests Swiss Trade sold were not securities; and neither summary judgment nor the relief granted the SEC are warranted. Some of Blackwell's arguments are not properly before this court; the others are without merit. We therefore affirm the judgment of the district court.

## I. Background

Blackwell and Winburn created Banner Fund International as a unit trust under the laws of the Jersey Islands in 1992. At about the same time, they began actively operating Swiss Trade, a limited liability company they had organized under the laws of Aruba. In 1993 they moved Swiss Trade to Belize City, where they established it as a Belizean International Business Company. Winburn served as Chair-

man of the Board and President of Swiss Trade and managed its daily operations, while Blackwell oversaw operations at several of Banner Fund's investments, including a shrimp farm located in southern Belize, where he spent most of his time.

Swiss Trade solicited funds from investors in the United States by means of a brochure and a one-page application form touting the "Off Shore Banner Fund International Arbitrage Program." Upon receiving an application and a check representing funds for investment, Swiss Trade exchanged the investor's money for a beneficial interest in Banner Fund. Instead of issuing the beneficial interest to the investor directly, however, Swiss Trade placed it in an irrevocable individual trust created under Belizean law (which Swiss Trade branded an "Endeavor Trust") naming Swiss Trade as the Trustee, Banner Fund as the settlor, and the investor as the beneficiary. The individual investor was not a party to the Endeavor Trust agreement and was not ordinarily apprised of the terms of the trust arrangement prior to investing. Swiss Trade had absolute control over the trust assets, including the right to refuse to return the investor's money. Swiss Trade did not register the beneficial interests in Banner Fund with the SEC.

The brochure advertising Banner Fund, drafted by Winburn and reviewed by Blackwell, was directed at low income individuals to whom Blackwell privately referred as "Joe lunch bag[s]." Their brochure represents that the Banner Fund Program will use leverage, which it describes as "borrowing against your assets at good multiples on favorable terms and [at] low interest," and arbitrage, which it describes as "the art of purchasing in one market for the [sic] immediate resale in another market," to "allow[ ] the little guy to take advantage of" deals previously available only to "insider[s]." Claiming that Banner Fund is an independent investment fund with "strong bank connections, knowledge of the market and the

workings of the insider's [sic] deals," the brochure promises to "put[ ] individual small investors together with others to leverage their funds to a point where they can participate." The brochure ends with a catalogue of the purported benefits of the Banner Fund Program, including a promise that Banner Fund would return any investment "[a]ny time after the first 180 days," and a hypothetical demonstration of how $5,000 invested in Banner Fund could grow to more than $25,000 in one year.

Initially Swiss Trade disseminated the brochure through Opportunity Seekers, an organization whose members are engaged in multilevel marketing in the United States. Later Winburn established the Fulfillment Center in Beaumont, Texas, which was organized as a trust under the laws of Delaware, to distribute brochures and other information related to Banner Fund. An investor in Banner Fund received $50 for each new participant he recruited, plus 20% of the new recruit's earnings from Banner Fund. Swiss Trade, which received 10% of each new recruit's earnings, sold packets of brochures and applications to investors who were interested in soliciting new members for the Banner Fund Program.

In order to help launch the referral system, Blackwell signed a letter (which he says Winburn wrote) urging each investor in Banner Fund to recruit ten new participants; he also aided the marketing team by giving them a chart showing how a $200 investment in Banner Fund could grow to $1,741 in one year. The marketing efforts reached people in 48 states, the District of Columbia, and several foreign countries. Eventually, Banner Fund attracted approximately 10,000 investors, mostly from the United States, and raised about $6.5 million dollars.

Swiss Trade sent monthly newsletters and account statements to investors. In the newsletters it emphasized Banner Fund's liquidity, stating, for example, that "[t]he investment staff know that they

must have funds in easily liquidated instruments in anticipation of any needs [an investor] might have to withdraw." Swiss Trade also used the newsletters to reassure investors that the Fund would be "leveraging to the maximum" by the end of 1993.

Swiss Trade deposited funds received from investors in the Banner Fund Program into its bank accounts in California, where they were commingled with Swiss Trade's general operating funds; that is, Swiss Trade used the same accounts to pay creditors and investors. Although Blackwell, Winburn, and Swiss Trade have refused on the basis of Belizean trust law to provide an accounting of the investors' funds, the SEC has traced more than $4.7 million of those funds. Three examples of its findings are particularly relevant to this appeal because they demonstrate Blackwell's involvement in the Banner Fund scheme.

First, Swiss Trade lent investors' money to Commonwealth Overseas, Ltd., a Belizean company, which in turn purchased the shrimp farm. After Blackwell had moved to the farm and well after the district court had ordered Swiss Trade to freeze its assets, Winburn and Blackwell caused Commonwealth Overseas to sell the farm to Sweetwater Investments, A.V.V., a company owned by Blackwell, for $3.2 million payable to Swiss Trade over five years. Second, a trust in which Swiss Trade had invested money intended for the Banner Fund Program lent $4,500 to Blackwell's daughter for college tuition; neither Blackwell nor his daughter ever repaid the loan. Finally, Swiss Trade put $120,000 into a trust that Blackwell controlled and that he used to purchase the house in which his family resides in Texas. Although Blackwell signed a note for the $120,000, he has not made any payments.

In February 1994 the SEC brought suit in the district court against Blackwell, Winburn, Swiss Trade, and several other defendants involved in the Banner Fund venture. The district court entered a temporary restraining order directing the defendants to freeze their assets, to account for and to repatriate funds received as part of the Banner Fund Program, and to stop soliciting or accepting new investors. One day later the SEC obtained from the district court a Letter of Request asking the courts of Belize to help in getting discovery of documents and of witnesses. On March 2, 1994 the SEC's attorney in Belize obtained an *ex parte* order from a Belizean court implementing the Letter of Request, as a result of which many documents relating to Banner Fund were placed in the custody of the Belizean court. On March 7 the district court issued a preliminary injunction extending the relief granted in the temporary restraining order. Contrary to the orders of the district court, Swiss Trade continued to solicit investors and to pay creditors, clients, and employees.

Blackwell and his co-defendants challenged the *ex parte* order of the Belizean court and in January 1995 the court reversed its decision implementing the Letter of Request. The Belizean court ordered that the documents remain in its custody, however, pending the outcome of the SEC's appeal. In December 1995, Blackwell and Winburn obtained a Belizean court order appointing Unicorn Trust, Ltd., a Belizean company, the successor to Swiss Trade as trustee for all the Endeavor Trusts, and directing Unicorn Trust to dissolve the trust of any beneficiary who so desired.

Meanwhile back in district court the SEC and Blackwell filed cross motions for summary judgment. The district court held that Blackwell and his co-defendants had violated § 10(b), the antifraud provision of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder; §§ 5(a), 5(c), and 17(a), the antifraud and registration provisions of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a); and § 7(d), the prohibition of unregistered foreign public offerings, of

608

the Investment Company Act of 1940, 15 U.S.C. § 80a–7(d). Accordingly, the district court granted summary judgment in favor of the SEC and enjoined Blackwell and his co-defendants from further violations. The court also ordered the defendants to disgorge $6.5 million plus prejudgment interest, provide an accounting of their assets, repatriate any assets belonging to investors in Banner Fund, and refrain from disposing of or otherwise transferring their assets. Blackwell and Winburn appealed but we dismissed Winburn's appeal when, after having been convicted of conspiracy to defraud the United States, he became a fugitive.

## II. Analysis

Blackwell raises a plethora of objections, none of which need long detain us. He contends that the district court lacks subject matter and personal jurisdiction and that, in any event, the court should have abstained under principles of international comity. Additionally, Blackwell attacks the substance of the district court's order on the grounds that he did not violate the securities laws of the United States because neither he nor his co-defendants sold securities; the SEC was not entitled to summary judgment upon the issue of his intent; and the court should not have entered an injunction against him because he was not an active participant in the Banner Fund scheme. He also maintains that this court should set aside the disgorgement order insofar as it applies to him because he no longer has access to assets related to Banner Fund. We begin, of course, with Blackwell's challenge to the subject matter jurisdiction of the district court.

### A. Subject Matter Jurisdiction

Blackwell contests the court's jurisdiction upon two grounds. First, he contends that the securities laws of the United States do not apply to his activities because they took place primarily in Belize. Second, he argues that the district court cannot adjudicate the SEC's claim because the Belizean courts have exclusive jurisdiction over the *res* of the Banner Fund.

### 1. Connection to the United States

■■■ Whether a federal district court has subject matter jurisdiction over an action arising under the securities laws of the United States is a question of congressional intent, subject only to "the broad limits set by the due process clause." *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 29 (D.C.Cir.1987). In the absence of evidence to the contrary, however, we presume that congressional "legislation ... is meant to apply only within the territorial jurisdiction of the United States" because the "Congress is primarily concerned with domestic conditions." *Id.* at 31 (in part quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). With these principles in mind, we conclude that the district court's exercise of jurisdiction in this case was fully justified and consistent with the intent of the Congress.

■■ (a) 1934 Act. The Congress has not indicated clearly whether § 10 of the Securities Exchange Act of 1934 is applicable to cases involving predominantly foreign securities transactions effected to some degree from outside the United States.* *See Zoelsch*, 824 F.2d at 29–30.

* Section 10 of the Exchange Act provides in pertinent part as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \*

(b) To use or employ, in connection with the purchase or sale of any security regis-

tered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b–5, in turn, provides:

We have previously indicated (in a dictum) that a United States court would have jurisdiction under the 1934 Act "whenever any individual is defrauded in this country, regardless of whether the offer originates somewhere else." *Id.* at 33 n. 4. The Second Circuit has gone further, unambiguously holding that "the anti-fraud provisions of the federal securities laws ... [a]pply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country...." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (1975); *see also Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128 n. 12 (2d Cir.1998) (reaffirming test announced in *Bersch* but stating "U.S. residence of individual investors—not American nationality—must be the focus of the ... test"). Because Blackwell and his codefendants operated to a significant degree from within the United States, however, when they defrauded United States investors, we need not decide today whether to adopt the *Bersch* test for extraterritorial jurisdiction. Instead, we hold only that when a resident of the United States is allegedly defrauded in the United States in connection with the sale of securities, the courts of the United States have jurisdiction under the 1934 Act.

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

* Section 17(a) reads:

Under this test, the district court properly asserted jurisdiction over the claims arising under § 10(b) of the Exchange Act and Rule 10b–5. The allegations of the SEC clearly make out a case in which Blackwell and his co-defendants defrauded investors who resided in the United States. Swiss Trade mailed brochures advertising Banner Fund to those investors, first through members of Opportunity Seekers operating as Swiss Trade's agents in the United States, and later from Swiss Trade's own affiliate in the United States, the Fulfillment Center. Swiss Trade's agents in the United States deposited investors' funds in banks located in the United States. In short, doing little more offshore than composing solicitations to be mailed to United States residents from locations in the United States, Blackwell and company defrauded thousands of investors resident in the United States. It requires no stretch of the imagination to conclude, as we do, that the Congress intended § 10(b) of the 1934 Act to apply to a case such as this, in which domestic investors were defrauded in large part by means of culpable acts committed in this country.

(b) 1933 Act. The district court's exercise of jurisdiction over the claim of fraud in violation of § 17(a) of the Securities Act of 1933 was also proper.* Section 17(a) is

> It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

in substance almost identical to § 10(b) of the 1934 Act and to Rule 10b–5, and we see no reason to think—in light of our conclusion that the district court properly asserted jurisdiction over the claims arising under those sections—that subject matter jurisdiction over the § 17(a) claim is any less proper, again, considering the domestic locus of the offer and sale of the securities and of the purchasers.

■ The range of transactions to which the registration requirements of § 5 of the 1933 Act apply is, however, more circumscribed. The SEC has limited the reach of that section as follows:

> For the purposes only of section 5 of the Act . . . the terms *offer, offer to sell, sell, sale,* and *offer to buy* . . . shall be deemed not to include offers and sales that occur outside the United States.

17 C.F.R. § 230.901. Reasoning that the Congress passed the registration requirements to "assure full and fair disclosure in connection with the public distribution of securities," the Second Circuit has interpreted this regulation to permit the exercise of subject matter jurisdiction over actions based upon "offers of unregistered securities that tend to have the effect of creating a market for unregistered securities in the United States." *Europe & Overseas Commodity Traders,* 147 F.3d at 126.

Through their extensive advertising and recruiting efforts, the defendants clearly created a market in the United States for beneficial interests in Banner Fund. Not only, as we have seen, did thousands of investors throughout 48 states and the District of Columbia purchase these inter-ests, but many of those investors were recruited to sell interests to others. The result can fairly be described, for the purposes of the 1933 Act, as "tend[ing] to have the effect of creating a market" for interests in Banner Fund. We hold in part II.D, below, that those interests are securities, and Blackwell does not dispute that they are not registered with the SEC. The district court therefore properly exercised jurisdiction over the claims arising under § 5 of the Securities Act.

■ (c) 1940 Act. The district court's exercise of jurisdiction over that portion of the SEC's claim arising under § 7(d) of the Investment Company Act of 1940 was also proper. By its terms, § 7(d) regulates the activities of foreign investment companies operating in the United States.* Here, the SEC alleges, and Blackwell does not dispute, that Blackwell and his co-defendants used the mails to offer to sell unregistered interests in Banner Fund, a foreign entity, without having gotten an order from the SEC permitting such offers. The actions as alleged clearly come within the condemnation of § 7(d) of the 1940 Act and the district court correctly asserted subject matter jurisdiction over those aspects of the SEC's complaint arising under that Act.

2. *In Rem* and *Quasi In Rem* Jurisdiction

Various proceedings concerning the *res* of the Banner Fund trust have been going on in Belize almost since the SEC filed this suit in the district court. Because of the potential for the two court systems to issue conflicting orders, Blackwell claims

---

* Section 7(d) reads:

> No investment company, unless organized or otherwise created under the laws of the United States or of a State, and no depositor or trustee of or underwriter for such a company not so organized or created, shall make use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a pub-lic offering, any security of which such company is the issuer. Notwithstanding the provisions of this subsection . . . the Commission is authorized, upon application by an investment company organized or otherwise created under the laws of a foreign country, to issue a conditional or unconditional order permitting such company to register under this title and to make a public offering of its securities . . . .

15 U.S.C. § 80a–7(d).

that the district court lacks jurisdiction until the Belizean proceedings are concluded. The SEC responds tersely to this argument, stating only that this "is not an *in rem* proceeding. It is [an] enforcement action" directed at Blackwell and his co-defendants. We reject Blackwell's challenge in part for that reason and in part because, to the extent that there may be a conflict between the courts of Belize and those of the United States, the district court asserted jurisdiction first and was therefore justified in adjudicating the case to its conclusion.

■ To a large extent, the SEC is correct that the suit in the district court is an enforcement action directed at Blackwell and his co-defendants rather than at the *res* of Banner Fund. Much of the relief the district court granted the SEC does not affect the *res* and, therefore, does not even potentially interfere with any orders the courts of Belize might issue concerning that *res*. Certain aspects of the district court's order do, however, concern the *res*. Specifically, the district court ordered Blackwell and his co-defendants: (1) not to dispose of any of their assets, including assets related to Banner Fund; (2) to repatriate all funds solicited for investment in Banner Fund; and, of less certain but arguable relevance to the *res*, (3) not to alter or otherwise dispose of any documents relating to transactions involving Banner Fund or the defendants' communications with each other.

Insofar as these aspects of the relief implicate the *res*, we observe that, according to longstanding precedent and practice, the first court seized of jurisdiction over property, or asserting jurisdiction in a case requiring control over property, may exercise that jurisdiction to the exclusion of any other court. This doctrine arose first in the context of Our Federalism, with its dual court system:

> Where the judgment sought is strictly *in personam*, for the recovery of money or for an injunction compelling or restraining action by the defendant, both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as *res adjudicata* in the other. But if the two suits are *in rem* or quasi *in rem*, requiring that the court or its officer have possession or control of the property which is the subject of the suit in order to proceed with the cause and to grant the relief sought, the jurisdiction of one court must of necessity yield to that of the other. To avoid unseemly and disastrous conflicts in the administration of our dual judicial system, and to protect the judicial processes of the court first assuming jurisdiction, the principle, applicable to both federal and state courts, is established that the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other.

*Penn General Casualty Co. v. Pennsylvania,* 294 U.S. 189, 195, 55 S.Ct. 386, 79 L.Ed. 850 (1935) (citations omitted); *see Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *see also Princess Lida v. Thompson,* 305 U.S. 456, 466, 59 S.Ct. 275, 83 L.Ed. 285 (1939). This first-in-time rule has since been applied to federal cases as to which there were cognate proceedings in the courts of another country. *See Dailey v. NHL,* 987 F.2d 172, 175–78 (3d Cir.1993) (district court must yield to Canadian court, which was first to assert *quasi in rem* jurisdiction); *Chesley v. Union Carbide Corp.,* 927 F.2d 60, 66 (2d Cir.1991) ("[T]he rule [is] equally applicable to requested interference by American courts with a res under the jurisdiction of a foreign court").

In the cited cases the courts of the United Stated yielded to the earlier asserted *in rem* jurisdiction of a foreign court, but we are aware of no reason for applying the rule asymmetrically, that is, only in cases where the foreign court is first to assume jurisdiction over the property. True, we cannot require a foreign court to

612

yield when the United States court was the first to assume jurisdiction, but neither can we acquiesce in a rule under which the United States court recedes regardless of its priority in time. That rule would empower a defendant in the United States to oust our courts of *in rem* jurisdiction merely by filing its own action in the courts of any hospitable country—of which there would be no shortage if that were our rule.

Even to the extent that this case is *in rem*, however, the first-in-time rule of jurisdiction offers Blackwell no comfort: The record reveals that the district court was the first to assert jurisdiction. The SEC filed this suit on February 24, 1994 and the next day the district court issued a temporary restraining order granting much of the relief that the court made permanent when it entered summary judgment for the SEC. By Blackwell's own account of events, the courts of Belize did not begin any proceeding related to Banner Fund's assets until, at the earliest, March 2, 1994—and that was at the instance of the SEC, which asked the Supreme Court of Belize to implement the Letter of Request issued by the district court. We therefore reject Blackwell's challenge to the subject matter jurisdiction of the district court.

B. Comity

Although the international aspect of this case does not deprive the district court of jurisdiction, it does raise a concern with comity among nations. For that reason, Blackwell argues that the district court should have stayed its hand pending the conclusion of proceedings in the courts of Belize, and that certain aspects of the district court's order offend the notion of comity by requiring the defendants to take actions that violate the laws of Belize. The SEC urges us to reject both arguments because, it asserts, accepting either argument "would allow fraudfeasors effectively to nullify United States [securities] law by conducting some part of their scheme overseas." We do reject Black-

well's comity arguments but upon grounds significantly more narrow than that urged by the SEC.

■ As we have explained before, comity "summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (1984). "Comity ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings based on the same transitory claim, at least until a judgment is reached in one action, allowing res judicata to be pled in defense." *Id.* at 939. Whether a case raises a concern with comity is inherently fact-dependant. Nonetheless, there are some general guidelines available to structure and to cabin the inquiry, including this one: "[A] domestic forum is not compelled to acquiesce in pre or postjudgment conduct by litigants which frustrates the significant policies of the domestic forum." *Id.* at 915. With these principles in mind, we turn first to Blackwell's contention that the district court should have abstained pending the outcome of proceedings in the courts of Belize.

■ The record discloses two such proceedings, the first of which, as we have said, was begun by the SEC on March 2, 1994 as part of its effort to obtain discovery. Through local counsel the SEC asked a Belizean court for assistance pursuant to the Letter of Request issued by the district court, which sought production and examination of documents and witnesses. Ultimately the Belizean court declined to help with the discovery request, from which order the appeal of the SEC is pending. Even if the SEC succeeds on appeal, however, its application for judicial assistance from the courts of Belize is not a ground for abstention by the district court because there is no potential for conflict between any orders the two courts might issue.

The second proceeding, which Blackwell and Winburn instituted in Belize, resulted in the substitution of Unicorn for Swiss Trade as the trustee of the Endeavor Trusts. While this proceeding does conflict with the action in the district court, it does not require the district court to abstain. As stated above, conduct by a litigant designed to frustrate a significant policy of the United States is not a ground for abstention on the basis of comity. Here, Blackwell and Winburn acted specifically to defeat the orders of the district court, which were issued in order to remedy the massive fraud that Blackwell and Winburn perpetrated against thousands of investors in the United States. If comity required the district court to defer to the Belizean court proceeding that Blackwell and Winburn initiated solely for the purpose of avoiding justice in the courts of the United States, then it would be a vicious doctrine indeed.

 Blackwell also complains that some of the relief ordered by the district court conflicts with the Trusts Act, 1992 of Belize. He asserts, for example, that the accounting requirement in the orders of the district court conflicts with the confidentiality requirement of the Trusts Act. We have been quite clear, however, that "one who relies on foreign law assumes the burden of showing that such law prevents compliance with the court's order," *In re Sealed Case*, 825 F.2d 494, 498 (1987) (citing *Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1374 (10th Cir.1978)), and this Blackwell has failed utterly to do. Indeed, to the extent there is anything in the record relating to this issue, it appears that it is Blackwell and his codefendants, not the laws of Belize, who prevent compliance with the orders of the district court. Section 4(4) of the Trusts Act provides that a trust agreement may allow the trustee to change the governing law from that of Belize to that of another jurisdiction, and the Endeavor Trust agreement contains just such a permissive clause. Therefore, Blackwell and his co-defendant

Winburn, who together owned and controlled Swiss Trade, which was the trustee for the Endeavor Trusts, could have changed the governing law to that of the United States and thus avoided any conflict with Belizean law. That is not to say that Blackwell had a legal duty to prevent a potential conflict between the Trusts Act and the orders of the district court; our point is simply that because he could have avoided any such conflict but chose not to do so, comity does not require the district court to stay its hand.

## C. Personal Jurisdiction

 In a fleeting passage in his opening brief, Blackwell asserts his affirmative defense that the district court lacks personal jurisdiction over him because he was never properly served with papers. His specific objection is that the "SEC was bound by the dictates of the Hague Convention in its efforts to serve Swiss Trade in Belize, as well as himself, in Belize, which it did not." This argument concerning personal jurisdiction is not burdened by any explanation of or citations to the relevant provisions of the Hague Convention. Any doubt about the considered nature of Blackwell's failure to develop the argument more fully is dispelled by his silence, both in his reply brief and at oral argument, in response to the SEC's detailed arguments demonstrating that Belize is not a signatory to the Hague Convention, and that the service of process upon Blackwell did in any event comply with the requirements of that Convention.

Federal Rule of Appellate Procedure 28(a)(9)(A) requires that the appellant's argument "contain [his] contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." We have repeatedly held that we will not address an "asserted but unanalyzed" argument because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the

parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983); *see United States v. Watson*, 171 F.3d 695, 699 n. 2 (D.C.Cir.1999) (declining to address "asserted but unanalyzed" argument); *United States v. Clarke*, 24 F.3d 257, 262 (D.C.Cir.1994) (same); *International Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1487 (D.C.Cir.1994) (same).

Blackwell's less than half-hearted effort upon the issue of personal jurisdiction is insufficient to put his objection before this court. We therefore decline to address Blackwell's argument concerning personal jurisdiction.

### D. Sale of Securities

The sections of the 1933, 1934, and 1940 Acts that the district court found Blackwell to have violated apply only to transactions involving "securities." *See* 15 U.S.C. § 77e(a) (1933 Act, regulating "[s]ale or delivery after sale of unregistered securities"); 15 U.S.C. § 77e(c) (1933 Act, prohibiting offers to sell or to buy unregistered security); 15 U.S.C. § 77q(a) (1933 Act, outlawing fraudulent practices in connection with sale of any security); 15 U.S.C. 78j(b) (1934 Act, prohibiting manipulative or deceptive practices in connection with sale of any security); 15 U.S.C. § 80a–7(d) (1940 Act, prohibiting investment company from offering for sale "any security of which such company is the issuer"). All three statutes define "security" to include an "investment contract," *see* 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10); 15 U.S.C. § 80a–2(a)(36). An investment contract is, for these purposes, anything that investors purchase with "(1) an expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others." *SEC v. Life Partners, Inc.*, 87 F.3d 536, 542

(D.C.Cir.1996) (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)).* The SEC maintains, and Blackwell denies, that the beneficial interests in Banner Fund, which Swiss Trade sold, are investment contracts.

### 1. Expectation of Profits

 The first element in the definition of an investment contract requires only that "the expected profits must, in conformity with ordinary usage, be in the form of a financial return on the investment, not in the form of consumption." *Life Partners, Inc.*, 87 F.3d at 543. Advertisements for Banner Fund clearly led potential investors to expect a "financial return" on their capital outlays. For example, the brochure distributed to potential investors gave, as one of the main reasons to invest, that Banner Fund offered "major returns and multiples in profits." Furthermore, Banner Fund's referral system induced others to recruit investors by promising recruiters 20% of any new investor's earnings from the Banner Fund Program. We think it obvious, therefore, that investors were induced to purchase beneficial interests in Banner Fund with the expectation of a financial return on their investments.

### 2. Common Enterprise

 The second element of the definition, that the investment be in a "common enterprise," is ordinarily met by a showing of horizontal commonality, *see Life Partners, Inc.*, 87 F.3d at 543 (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir.1994)), which requires that there be a "pooling of investment funds, shared profits, and shared losses." *Id.* The Banner Fund Program putatively pooled in-

---

* *Howey* arose under the 1933 Act. Because the definition of "security" is "virtually identical" in the 1934 Act, the Supreme Court has held that "the coverage of the two Acts may be considered the same." *Reves v. Ernst & Young*, 494 U.S. 56, 61 n. 1, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (citation omitted). In-

asmuch as the definition of "security" in the 1940 Act, *see* 15 U.S.C. § 80a–2(a)(36), is in turn virtually identical to the cognate definitions in the two earlier Acts, we hold that the elements of *Howey* are also applicable to the 1940 Act.

vestment funds by, in its own words, "put[ting] individual small investors together with others to leverage their funds to a point where they can participate." The very premise upon which Swiss Trade marketed the program was that Banner Fund would combine funds from small investors so that they could participate in deals requiring large capital outlays. Indeed, the brochure advertising the program ends by stating:

> Perhaps the only thing that keeps you out of the market is money ... money in sufficient amounts to be "respectable" in the market place. In Banner Fund International you can, working with others, with an accumulative amount sufficient to do the job.

Simply placing investors' funds into individual trusts before pooling them did not, as Blackwell contends, change the pooled nature of the Banner Fund Program.

Equally apparent are the profit and loss sharing aspects of the Banner Fund Program. Each investor received a portion of Banner Fund's monthly earnings based upon the amount of his investment. In addition, the referral program allocated 10% of each investor's earnings to Swiss Trade and 20% of those earnings to whomever recruited the investor for Banner Fund. Banner Fund's pooling of investors' money and its spreading of profits and losses among investors, recruiters, and Swiss Trade demonstrate horizontal commonality sufficient to meet the second element of the definition of an investment contract.

### 3. Efforts of Others

The third element of the definition requires that "profits be generated ... 'predominantly' from the efforts of others," not counting purely "ministerial or clerical" efforts. *Life Partners, Inc.*, 87 F.3d at 545 (citing *SEC v. International Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C.Cir. 1992)). Again, the Banner Fund Program meets this requirement. An individual investor in Banner Fund was supposed to receive returns without exerting any effort himself. According to the brochure advertising the program, Swiss Trade was to manage all funds in its capacity as trustee. Although an investor separately could earn $50 for each new person he recruited into the program, the return from his financial investment was to come from the "arbitrage and leveraging" transactions Banner Fund was supposedly conducting.

In sum, the Banner Fund Program has all the elements of an "investment contract." Accordingly, we hold that beneficial interests in Banner Fund are securities.

### E. Summary Judgment

Blackwell argues that because he denied the SEC's allegations that he made false and misleading statements in connection with the sale of securities, the district court should not have disposed of the securities fraud claims on summary judgment. We review *de novo* the district court's grant of summary judgment, *see Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C.Cir. 1996), but because Blackwell did not properly controvert the SEC's statement of undisputed facts before the district court we will not now consider his arguments predicated upon there being a dispute over those facts. After reviewing the evidence properly presented to the district court, we conclude that the SEC was entitled to summary judgment.

Under Federal Rule of Civil Procedure 56(c), the district court is to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party opposing such a motion on the ground that there are material facts in dispute must "set forth [the] specific facts showing that there is a genuine issue for trial." FED.

R.Civ.P. 56(e). In the United States District Court for the District of Columbia, a party opposing a motion for summary judgment must also comply with Local Rule LCvR 7.1(h), which provides in relevant part:

> An opposition to ... a motion [for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement .... In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

If the party opposing the motion fails to comply with this local rule, then "the district court is under no obligation to sift through the record" and should "[i]nstead ... deem as admitted the moving party's facts that are uncontroverted by the non-moving party's Rule [LCvR 7.1(h) ] statement." *Jackson*, 101 F.3d at 154.

■ Although he filed a statement pursuant to Rule LCvR 7.1(h) in support of his own motion for summary judgment, Blackwell did not follow the rule in opposing the SEC's motion for summary judgment; instead he filed a response and an affidavit, neither of which pointed to specific parts of the record controverting the SEC's lengthy statement of undisputed facts. The district court was therefore fully justified in treating as admitted the SEC's statement of material facts. Those facts, only some of which we have recounted above, detail at length Blackwell's role in preparing statements, which he knew were false and misleading, and in sending them to investors and potential investors. We therefore affirm the district court's grant of summary judgment. *Cf. Jackson*, 101 F.3d at 154 ("It was irrelevant [once

the court struck the opposing party's Rule 7.1(h) statement] whether the record could have supported a finding of a genuine issue of material fact").

### F. Injunctive Relief

■ Blackwell argues that because he was not an "active participant" in Banner Fund's "financial dealings," the district court committed reversible error by entering an injunction against him. We review the district court's grant of an injunction only for abuse of discretion; that is we will not "disturb [its] remedial choice unless there is no reasonable basis for the decision." *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1228 (D.C.Cir.1989).

■ The essence of Blackwell's argument is that Winburn managed Swiss Trade's daily operations and Winburn did not provide Blackwell with access to client account records. Even if this be true, it does nothing to undermine the district court's grant of injunctive relief against Blackwell. There is abundant evidence in the record documenting Blackwell's extensive involvement with the Banner Fund scheme. He reviewed the brochure advertising the Banner Fund Program. He signed a letter urging investors to recruit new members. He used investors' funds to purchase a house for his family and to pay his daughter's college tuition. He helped Winburn substitute Unicorn for Swiss Trade as the trustee for the Endeavor Trusts, thereby flouting the district court's order directing him to freeze Swiss Trade's assets. Although Blackwell may have played Cassius to Winburn's Brutus—the record does not reveal whether he has a lean and hungry look—he was far from a passive bystander in the securities law violations committed in connection with the Banner Fund Program. Therefore, the district court did not abuse its discretion in entering injunctive relief against Blackwell.

### G. Disgorgement

The final dispute before us concerns the district court's order requiring Blackwell and his co-defendants to "disgorge $6.5 million, plus prejudgment interest in the amount of $2,697,303.84 representing their unjust enrichment from their violations of the statutes set forth above." Blackwell maintains that he cannot comply with the order because he does not have access to any assets related to Swiss Trade or to Banner Fund. The SEC in turn contends that Blackwell does control some of Banner Fund's assets and that, in any event, the disgorgement order imposes an obligation upon Blackwell personally, which he may satisfy using his own assets. Because disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset, we reject Blackwell's challenge and affirm the district court.

An order to disgorge is not a punitive measure; it is intended primarily to prevent unjust enrichment. *See, e.g., First City Financial Corp., Ltd.,* 890 F.2d at 1231. Accordingly, a court "may exercise its equitable power [of disgorgement] only over property causally related to the wrongdoing." *Id.* As the SEC points out, the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge. To hold, as Blackwell maintains, that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. Under Blackwell's approach, for example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement. Blackwell's would be a monstrous doctrine for it would perpetuate rather than correct an inequity.

Blackwell's approach also conflicts with longstanding precedent. In a securities fraud case dealing with disgorgement, the Second Circuit upheld an order directing the defendant to disgorge his "paper profits." *See SEC v. Shapiro,* 494 F.2d 1301, 1309 (1974). The defendant in that case had purchased stock without disclosing material, non-public information, in violation of § 10(b) of the 1934 Act and of SEC Rule 10b–5. *Id.* at 1307. Had the defendant sold the stock promptly after the information became public, he would have made a handsome profit; in the event, however, he held the stock too long and sold it at a lesser gain. *Id.* at 1309. The district court nevertheless ordered him to disgorge all the profits he would have made had he sold the stock at the higher price. The court of appeals affirmed, stating:

> The district court's approach was reasonable. A violator of the securities laws should disgorge profits earned by trading on non-public information. Once public disclosure is made and all investors are trading on an equal footing, the violator should take the risks of the market himself.

*Id.; see also SEC v. UNIOIL,* 951 F.2d 1304, 1306 (D.C.Cir.1991) (Edwards, J., concurring). As the Second Circuit decision makes clear, an order to disgorge establishes a personal liability, which the defendant must satisfy regardless whether he retains the selfsame proceeds of his wrongdoing. We therefore reject Blackwell's challenge to the disgorgement order.

### III. Conclusion

For the forgoing reasons the judgment of the district court is in all respects

*Affirmed.*