WILLIAMS, Senior Circuit Judge,
concurring.
I join the opinion for the court. I write separately to emphasize problems with the government’s fallback interpretation of 18 U.S.C. § 1964(a), under which the government could obtain disgorgement for purposes of reducing the defendant’s ability to commit future RICO violations, with the amount accordingly limited to assets “being used to fund or promote the illegal conduct, or [that] constitute capital available for that purpose.” United States v. Carson, 52 F.3d 1173, 1182 (2d Cir.1995). This superficially appealing interpretation in fact creates a kind of pushmi-pullyu, a beast that Congress is most unlikely to have ordained.
I.
The statute gives district courts- “jurisdiction to prevent and restrain- [RICO] violations.” 18 U.S.C. § 1964(a). Reasoning that pure deterrence was an impermissible objective of orders under § 1964(a), the Second Circuit went on to find that disgorgement could “prevent and restrain” if limited to the amount of ill-gotten gains that were. “being used to fund or promote the illegal conduct, or constitute capital available for that purpose.” Id. at 1182. Because money is fungible, as indeed are virtually all resources when viewed as enablers of future criminal conduct, the government here refines its Carson-derived fallback position, quite sensibly rejecting any limitation to “ill-gotten gains” in the form of specific money or resources so gained. Such a limit, we have said (applying a different statute), would lead to. absurd results. SEC v. Banner Fund International, 211 F.3d 602, 617 (D.C.Cir.2000). There the defendant proposed to confine disgorgement to the “actual assets” unjustly received. We said that what mattered was not the specific assets but the amount by which, the defendant was unjustly enriched; the alternative -would allow a defendant to escape liability by spending ill-gotten gains while husbanding other assets. Id. at 617. Thus the government’s proposal is that the amount of the ill-gotten gains should set a ceiling on the disgorgement recovery, subject to the further limit mentioned above — essentially purporting to limit the disgorgement to crime-enabling resources, broadly construed.
In Carson itself the court ruled that this prevented the government from forcing disgorgement of funds, ill-gotten in the distant past, from a RICO defendant by then retired from the RICO enterprise itself (a union). In the context of corporate defendants such as those before us, a possible limit would be the entire net worth of the companies (a good deal less than the $280 billion that the government claims to have been ill-gotten gains). But perhaps not. Even that limit is arbitrary, *1203 as resources can be used for criminal purposes even if offset by company debt. Subject to the bankruptcy laws, nothing in the logic of the crime-enablement theory clearly calls for stopping at confiscation of the shareholders’ interests; why not the bondholders’ as well?
On the other side, it might be plausible under the Carson theory to exempt firm resources now devoted to non-tobacco enterprises. It is probably about as difficult for these defendants to re-alloeate resources from the businesses of cheese and crackers, for example, to criminality in the sale of cigarettes, as for the union in Carson to lure Carson and his funds back from retirement to union criminality.
In short, Carson and the government’s fallback position send the court off on a virtually metaphysical quest to draw lines based on the likelihood that particular resources will be devoted to crime.
II.
It is hardly surprising that there are only gossamer lines between drastic disgorgement (destruction of bondholder as well as shareholder wealth) and relatively mild disgorgement (cordoning off resources in non-tobacco subsidiaries). The plain fact is that wealth deprivation is an extremely crude device for “preventing]” criminal behavior. Granted, a criminal miscreant with a billion dollars is potentially more dangerous than an impoverished criminal miscreant. But ordinarily the forces most affecting the likelihood of criminal action are, besides the actors’ ethical standards and sense of shame, truly forward-looking conditions: the returns to crime versus the possible costs, all adjusted for risk (such as the risk of getting caught).
Confusion arises from an ambiguity in our understanding that, in the civil context, such remedies as damage awards and restitution “deter,” and thus in a sense “prevent” commission of torts, breaches of contract, and other civil wrongs. ■ It is quite true that a rule or practice of awarding such remedies deters, and thus prevents, such wrongs. Indeed, under one viewpoint that is the primary or even sole purpose of awarding such remedies. See William M. Landes & Richard A. Posner, The Economic Structure of Tort Law (1987). But it is the rule or practice that creates the incentive. To make the rule credible, of course, the awards must be made; but no individual award has a material deterrent effect.
To evaluate that last statement consider a society that empowered some deus ex machina to randomly excuse one damage judgment in a million. Such an exception to the rules would have no detectable effect on the commission of torts or breaching of contracts. Even the lucky defendant who enjoyed the benefit of the pardon wouldn’t — unless a complete fool — materially alter his future conduct because of that manna from heaven.
The equity court, empowered under § 1964(a) to “prevent and restrain” future violations, has before it the history of the defendant, including his past wrongs. It can decree relief targeted to his plausible future behavior. It can define the conditions bearing directly on that behavior. It can, for example, establish schedules of draconian contempt penalties for future violations, and impose transparency requirements so that future violations will be quickly and easily identified.
In assessing the likelihood that Congress intended an additional disgorgement remedy, it makes sense to inquire into the tendency of such an implied remedy to “prevent and restrain” future violations by the defendant. Of course the rule the government seeks here would be a rule, *1204 not merely a random extra penalty. But the question would be its incremental effect, on. top of (1) RICO’s explicit provisions for . criminal penalties (including disgorgement ■ and imprisonment ■ under § 1963(a)) and for victim recoveries (trebled) under § 1964(c), and (2) the whole available panoply of genuinely forward-looking remedies — express- controls over substantive conduct, transparency-enhancing orders, and contempt penalties for violations. It seems almost inconceivable that many aspiring criminals would find the incremental risk decisive. I find it hard to imagine a waffling villain — already in court for RICO violations — saying to himself: “Well, my chances of escaping § 1963(a) forfeiture and imprisonment because of the statute of limitations and the burden of proof, and of escaping treble damages under § 1964(c), and contempt penalties for violating the court’s orders, still leave RICO violations attractive on a net basis; but that implied disgorgement under § 1964(a) — wow! Too much. It tilts me over the line.”
The weakness of that scenario supports the inference that for the defendant who winds up before the equity court, Congress intended the words “prevent and restrain” to authorize only a tailored, forward-looking remedy. Penalties for violations of the court’s decree, and transparency-enhancing measures meet that standard. A purported § 1964(a) disgorgement remedy, on top of those explicitly authorized, would provide only a trivial incremental effect (the reverse of the pardon granted once in a million), and would not qualify. Nor would disgorgement aimed at reducing the defendant’s crime-enabling resources, a factor linked only crudely to his future tendency toward criminality.
Once we (1) accept the proposition that § 1964(a) limits the equity court to forward-looking remedies, as even the dissent appears to do with respect to the government’s narrower argument, see Dissent at 1224-25 (“I also share the Second Circuit’s apparent conclusion ... that disgorgement may be ordered only to prevent and restrain a defendant from future RICO, violations.”), and (2) reject the supposition that “whatever hurts a civil RICO violator necessarily serves to ‘prevent and restrain’ future violations,” Carson, 52 F.3d at 1182, the court must try to draw lines between equitable remedies that merely “hurt” the defendant and ones that have a genuine tendency to “prevent and restrain” his future violations.
Because disgorgement under § 1964(a) so evidently lacks that tendency, the dissent relies on Porter and on the government’s experts. Porter indeed includes the twice cited phrase suggesting that “[fjuture compliance may be more definitely assured if one is compelled to restore one’s ill-gotten gains.” Dissent at 1223, 1224. But the statute at issue in Porter gave district courts power to issue orders “enforcing compliance” and thus didn’t seem to narrow the grant to forward-looking remedies. Indeed the Porter dissent never suggests such a limit; nor, so far as appears, did the defendant firm. For construing § 1964(a), Porter is of remarkably little help.
The expert testimony offered by the government for the proposition that backward-looking disgorgement will “ ‘prevent and restrain’ defendants from committing future RICO violations,” see Dissent at 1226, serves, no better. Obviously such testimony cannot alone resolve the issue, turning legal analysis of the statute into a fact battle among experts. Thus the experts’ testimony is valuable for its analytic quality, not its utterance by a PhD.
The dissent’s genuflection before the experts leaves the reader to imagine some supporting analysis. Lest the imagination *1205 run riot, I attach an appendix containing all of the expert testimony that the government saw fit to offer on the point in the summary judgment motion. The crux is Dr. Franklin Fisher’s statement:
[Defendants’ experts] have also suggested that enjoining Defendants from future illegal behavior and threatening them with the possibility of financial penalties would be more effective as future deterrents than would be disgorgement. Professor Weil, for example, suggests that ‘the Court could establish now a schedule of fines or punishments that it would levy should the Defendants engage in prohibited behavior.’ These experts forget that laws prohibiting this behavior already exist and that, despite these laws and their associated remedies, the Defendants allegedly chose to engage in the illegal behavior. In this context, it is important to note that requiring Defendants to pay proceeds would strengthen the credibility of existing laws and thus provide additional economic incentives to deter future misconduct.[1]
While it is a nice rhetorical move to point out that the defendants violated RICO (as we must assume) despite existing sanctions, Fisher offers no analysis as to why the presence of a civil disgorgement remedy in favor of the government would have reduced the likelihood of violations. (Indeed, on the government’s theory — that the statute actually creates such a remedy — the defendants would have taken that into account in deciding to proceed with violations.) More important, Fisher looks at the wrong setting. Before this (or any) RICO litigation against a particular defendant, that defendant would have operated without the spotlight of the lawsuit itself. (That may explain why the government let the statute of limitations run for decades, and why the victims failed to seek treble damages.) Now the spotlight is on, and the plausible explanations for non-application of the explicit remedies (other than § 1964(a) equitable relief) have disappeared. And the district court can amplify the spotlight with transparency-enhancing and prior-approval measures. The real question is whether the imposition of this extra remedy on the defendants before the court — backward-looking civil disgorgement in favor of the government — would materially alter their readiness to persist in violations, in the face of all RICO’s explicit remedies, and a forward-looking schedule of penalties for even minute infractions, made doubly effective by compulsory disclosure and approval measures. The government’s experts simply did not address that question. This court’s own analysis provides a clear answer that the extra “remedy” would not do so.
The dissent’s use of the government’s experts is part of its effort (in its qualified endorsement of the government’s fallback position) to transform an issue of statutory interpretation into one of fact. See Dissent at 1222-23, 1227-28; see also id, at 1223 (noting that in Meghrig v. KFC Western, Inc., 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996), there was no affirmative evidence that the defendants were likely to commit future RCRA violations, and thus suggesting that the case was something other than pure statutory interpretation). But the “facts” hypothesized by the dissent are unrelated to the real world faced by RICO defendants — already arraigned for their past offenses and sub *1206 ject to a battery of new disincentives on top of all RICO’s conventional explicit remedies. Statutory interpretation shouldn’t turn on factual hypothetical such as, “What if pigs had wings.”
III.
The above analysis seems to me to confirm what intuition suggests about the jurisdictional issue in this case. Even the most narrowly formulated question about the validity of the district court’s order— the choice between the government’s primary position (that § 1964(a) creates unlimited discretion to order disgorgement) and its fallback position (that it provides authority to award crime-enabling disgorgement) — requires the court to plumb the meaning of § 1964(a). The issues in this case, all turning on the interpretation of § 1964(a)’s lone sentence, are so thoroughly enmeshed that we needn’t explore the court’s language limiting § 1292(b) jurisdiction to issues “logically interwoven” with the explicitly identified issue. Maj. Op. at 1196. The dissent’s hypotheticals as to what might be covered, see Dissent at 1212, plainly depend on an astonishingly broad notion of either logic or weaving. Having analyzed § 1964(a) and having found the order in conflict with its terms, the court must reverse.
One final note. The dissent chides the court for creating a circuit split. See Dissent at 1208. But if we confined ourselves to what the dissent acknowledges to be properly before us, and adopted the dissent’s preferred position (that disgorgement is available like any other equitable remedy, regardless of its likely effects on a defendant’s future behavior, simply because RICO doesn’t explicitly preclude it), we would create no less of a split between this circuit and the Second.
Appendix
Excerpt from United States Memorandum in Opposition to Defendants’ Motion for Partial Summary Judgment Dismissing the Government’s Disgorgement Claim, Appellee’s Appendix at 812-14.
B. Disgorgement Provides Economic Incentives That Will Prevent Further RICO Violations
172. Despite the fact that it is not necessary for the United States to prove this, disgorgement will prevent and restrain further bad acts.
173. Drs. Fisher and Kothari have both stated in their expert reports and deposition testimony, that disgorgement of the proceeds calculated by Dr. Fisher would in fact act to prevent and restrain future RICO violations. Dr. Fisher directly addressed this point in his rebuttal report in which he states:
Defendants’ experts have suggested that disgorgement of ill-gotten gains such as the proceeds sought in this matter will not serve the goal of preventing or restraining the defendants from engaging in similar bad acts in the future. For example, Professor Carlton argues, “Having to disgorge past proceeds, by itself, would not affect a defendant’s incentives to engage in misconduct in the future because it would not affect the returns (if any) from future misconduct.” I address these criticisms with well-known economic principles. What Professor Carlton and the other defendants’ experts who espouse this view fail to recognize is that requiring defendants to pay proceeds will affect their expectations (and those of others contemplating malfeasance) about the returns from future misconduct. As a matter of economic principle, the higher the proceeds *1207 amount, the lower the expected returns from future misconduct and the greater the desired effect of deterrence.
Expert Rebuttal Report of Franklin Fisher, United States v. Philip Morris, (R. 1450; filed July 24, 2002) at 4-5 ¶ 12.
174. Dr. Kothari’s expert report con- ' firms Dr/ Fisher’s conclusion:
Requiring the defendants to pay ill-gotten proceeds is relevant. The economic incentive for illegal behavior is higher (for defendants and onlookers) if defendants are not required to pay the proceeds. While payment of proceeds has some of the features of sunk cost, it is not identical to a sunk cost because it will affect future decisions or behavior. The higher the proceeds paid the greater the economic incentive to avoid illegal behavior in the future.
Expert Report of S.P. Kothari, United States v. Philip Morris, (R. 1451; filed July 24, 2002) at 3-4, ¶ 8.
175. Dr. Fisher expressly states in his expert report:
[Defendants’ experts] have also suggested that enjoining Defendants from future illegal behavior and threatening them with the ' possibility of financial penalties would be more effective as future deterrents than would be disgorgement. Professor Weil, for example, suggests that ‘the Court could establish now a schedule of fines or punishments that it would levy should the Defendants- 'engage in prohibited behavior.’ Tliese experts forget that laws prohibiting this behavior already exist and that,-'despite these laws and their associated remedies, the Defendants allegedly’ chose to engage in the illegal behavior. In this context, it is important to note that requiring Defendants to pay proceeds would strengthen the credibility of existing laws and thus provide additional economic incentives to deter future misconduct.
Expert Rebuttal Report of Franklin Fisher, United States v. Philip Morris, (R. 1450; filed July 24, 2002) at 5-6, ¶ 14. 176. Dr. Fisher has repeatedly confirmed the preventative benefit of disgorgement. At his deposition he stated:
Q.... the idea is that disgorgement prevents and restrains future violations by altering the defendants’ expectations about the returns they might receive from future misconduct. Is that right?
A.... I believe that to be correct.
Q. Does disgorgement prevent and restrain future RICO violations in any other way?
A. Well, it removes at least some, and possibly all, of the assets with which to engage in future illegal activities.
Deposition of Franklin Fisher, United States v, Philip, Morris, September 12, 2002, 828:4-19 (Exhibit 77).
177. “[A]s I have repeatedly and clearly stated in my report and deposition testimony, disgorgement of Defendants’ proceeds, as I. have calculated them, would in fact act to prevent and restrain future RICO violations.” Declaration of Franklin Fisher, United States v. Philip Morris, at 7, ¶ 16 (Master Rule 7.1/56.1 St. Exhibit 5)