**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Plaintiff,

v.

**Steven J HENKE and Chan M Desaigoudar, Defendants.**

**No. C–98–4011 VRW.**

United States District Court,
N.D. California.

July 31, 2003.

See also 965 F.Supp. 1327.

John S. Yun, Securities & Exchange Commission, San Francisco, CA, for S.E.C.

Nina Wilder, Weinberg & Wilder, San Francisco, CA, for Steven J. Henke.

Frank R. Ubhaus, Jamie Lee Moore, Berliner Cohen, San Jose, CA, for Chan M. Desaigoud.

## ORDER

WALKER, District Judge.

By this action, plaintiff United States Securities and Exchange Commission seeks civil penalties against defendant Chan M Desaigoudar for numerous violations of securities law. The case against Desaigoudar was tried before the court without a jury on December 16, 17 and 18, 2002. See Docs ##86–88. The matter was submitted upon filing of the parties' post-trial closing briefs on February 7, 2003. See Docs ##94–96. The court now makes its findings of facts and conclusions of law:

## I FINDINGS OF FACT

1  Plaintiff is the United States Securities Exchange Commission (the SEC).

2  Defendant is Chan M Desaigoudar, an individual.

3  During the time in question, Desaigoudar was the chief executive officer and chairman of the board of directors of California Micro Devices (CMD), a corporation whose stock was traded on the open market. CMD, which Desaigoudar founded, supplies semiconductor and thin-film products.

4  In its 1994 Form 10–K, CMD represented that revenue from product sales is recognized upon shipment and that its financial information was presented in accordance with generally accepted accounting principles (GAAP). To recognize revenue in a particular fiscal period, CMD was required to ship the product before the end of the last day of the fiscal period. Alternatively, CMD could recognize revenue in a fiscal period by completing a "title transfer" of the goods in question if the customer previously signed documents indicating irrevoca-

ble acceptance of ownership of the goods.

5  During fiscal year 1994, which ended on June 30, 1994, CMD was experiencing cash flow problems due in part to production delays, extended payment terms to certain overseas customers and the failure of certain customers to make timely payment for goods received.

6  In order to improve the company's financial appearances and to position it for an advantageous strategic alliance that might bring in cash to alleviate the company's cashflow problems, CMD officials engaged in improper revenue recognition and accounting practices.

7  At the time, Desaigoudar was aware both of CMD's cashflow problems and of its improper revenue recognition and accounting practices.

8  In October 1993, Desaigoudar received a fax from the general manager of one of CMD's manufacturing facilities in Tempe, Arizona, discussing the company's practice in some cases of recognizing revenue for products that had not yet been shipped or manufactured.

9  In a memorandum dated January 24, 1994, Desaigoudar wrote to other company officers that attempts to collect on unpaid receivables were "dismal" and that it was "absolutely imperative that we run our company on a positive cash flow basis from now on." Pl Exh 262. Shortly thereafter, the company began to impose stricter credit terms for certain overseas customers.

10  In early 1994, Desaigoudar was aware not only that many customers owed substantial sums of receivables but that these receivables also included revenue booked for products that had not been shipped. In a memoran-dum dated March 18, 1994, Ron Romito, CMD's vice president and chief accounting officer at the time, referenced $3,835,000 in revenue characterized as "delayed shipment." Pl Exh 40 at 2.

11  Efforts to collect on these receivables were frequently discussed by CMD officers, including Desaigoudar, during the final quarter of fiscal year 1994.

12  On April 7, 1994, Desaigoudar, Romito and others met in Desaigoudar's office to discuss the company's current finances and the status of its ongoing collection efforts. See Pl Exhs 263, 264. These documents referred to $3,936,000 in "delayed shipment" and $4,354,000 in invoices during the third quarter for unshipped product issued at one of its manufacturing facilities, located in Milpitas, California. Pl Exh 264 at 6.

13  At the meeting, Romito emphasized the importance of cleaning up the revenue recognized in prior quarters before the end of the fiscal year by shipping as much product and collecting as much cash as possible before June 30, 1994. Desaigoudar acknowledged the importance of these goals. Desaigoudar further advised Romito not to use the term "delayed shipment" in future memoranda but instead to use the term "title transfers." Desaigoudar also urged others to keep quiet while CMD's revenue problems were being rectified.

14  Desaigoudar assigned Romito the task of determining how any write-off would be presented to investors. Desaigoudar, in agreement with other officers, advised that write-offs be characterized as cost of sale as opposed to a reduction in revenue because a higher revenue figure was

preferable in the eyes of potential investors.

15 On May 3, 1994, CMD issued a press release announcing its results for the third fiscal quarter ending March 31, 1994. That press release, which listed Desaigoudar as a contact person, improperly included $3.9 million in second quarter revenue and $4.3 million in third quarter revenue for product that had not been shipped.

16 During the final quarter of fiscal year 1994, on May 5, 1994, CMD and Hitachi Metals Limited (Hitachi) announced that Hitachi had concluded its purchase of 880,000 CMD shares at a price of $24 per share as part of the companies' strategic alliance.

17 In July 1994, the company wrote off $12 million in revenues, but falsely attributed nearly all of the write-off to causes such as product returns, bad debt and warranties when in fact, between $5 and $7 million of the write-off resulted from unshipped product.

18 On August 4, 1994, with Desaigoudar's prior review and approval, CMD issued a press release with its fourth quarter and 1994 fiscal year results for the period ending June 30, 1994. The press release stated that CMD was taking a $12.7 million write-off in the fourth quarter, including $5.3 million for returned product, $1.7 million in cost of sales charges for terminated distributors and $1.3 million in bad debt expenses.

19 The August 4, 1994, press release also overstated CMD's revenues by including products shipped to freight forwarders rather than real customers.

20 Even though Desaigoudar knew that the write-off was necessitated by recognizing revenue for unshipped product, he nonetheless knowingly or recklessly misrepresented the write-off as a move to "strengthen the distribution channel in the Far East" because of the "top line distributors" who purportedly would become available as a result of CMD's strategic alliance with Hitachi. During the conference call, Desaigoudar further misrepresented the cause of the write-off by suggesting that CMD eliminated certain distributors because the company had received unsolicited requests for its products in other countries.

21 In response to the high volume of calls to the company concerning its reported fiscal year 1994 results, CMD decided to send a letter to shareholders. Desaigoudar authored a portion of the letter stating that the company's recent write-off was due to reforms to its distribution channels as the result of its strategic alliance with Hitachi. Desaigoudar falsely represented that the company expected to resell the inventory it had taken back from distributors, even though there was no basis to have made that statement.

22 On September 20, 1994, Desaigoudar and other company officers signed a representation letter to CMD's outside auditors, Coopers & Lybrand, falsely stating that the company's financial statements were fairly presented, that all material transactions had been properly recorded, that there were no accounting irregularities and that the company's receivable balance was correct. Desaigoudar testified that he did not read the representation letter before he signed it; accordingly, he recklessly signed a materially false or misleading representation letter to CMD's outside auditors.

23 On September 23, 1994, Desaigoudar and other company officials also signed CMD's Form 10–K filing for

the fiscal year 1994. The Form 10–K, which was filed with the SEC on September 28, 1994, contained the annual revenue numbers that had appeared in the company's August 4, 1994, press release. The filing also falsely claimed that CMD had recorded a $5.3 million charge because it had terminated distributors as a result of the Hitachi strategic alliance. Desaigoudar admits that he reviewed a draft of the annual report containing these figures; hence, Desaigoudar knew that the revenue figures contained in the Form 10–K were false.

24 As part of his written plea agreement in related criminal proceedings, Desaigoudar admitted that during fiscal year 1994, he "became aware that customer accounts' [sic] receivable balances were far too high, that these balances were aging and would be difficult to collect. I understood that unless these problems were corrected by fiscal year end, we would have to reduce the value of accounts' receivable by substantial write-offs and/or write-downs. These problems were symptomatic of widespread accounting fraud at [CMD], including the booking of revenue for goods that had not been shipped or, in some cases, even manufactured. I should have known, based on documents and other information available to me, about the nature and scope of this fraud and should have undertaken additional remedial steps before the end of fiscal year 1994." Pl Exh 282 at 2.

25 Desaigoudar claims that he was deliberately deceived by other company officials concerning the state of CMD's financial affairs. Desaigoudar contends that he did not receive many of the communications by other company officials concerning delayed shipment receivables, although Desaigoudar admits to having participated in the April 7, 1994, meeting during which the company's improper revenue recognition practices were discussed.

26 While Desaigoudar attempts to lay the blame at the feet of others within the company, the evidence indicates that Desaigoudar was involved as an active participant in the management of company affairs and in the misstatements noted above. It is undisputed that Desaigoudar personally reviewed frequent interim reports of the company's financial status. As the company's largest single shareholder, Desaigoudar had an incentive to engage in a vigorous investigation of improprieties in the company's accounting and take disciplinary action against those responsible promptly after learning of such improprieties. Yet, even after the April 7, 1994, meeting, Desaigoudar undertook no such investigation. Desaigoudar's effort to lay the blame at the feet of others in the company is simply not credible. From Desaigoudar's inaction, the court infers that Desaigoudar played a role in the knowing dissemination of false and misleading information about CMD.

27 Desaigoudar's central role in the fraudulent scheme to inflate revenue figures and conceal CMD's accounting problems helped give rise to an inflated stock price. On April 30, 1994, Desaigoudar executed a sale of CMD stock even though he knew that its share price was fraudulently inflated due to his management of the company, thereby avoiding a loss of approximately $573,000.

28 On September 17, 1997, the government initiated criminal proceedings against Desaigoudar, alleging numerous violations of securities laws. See Case No CR–97–294.

29 On July 15, 1998, Desaigoudar was found guilty by a jury in the related criminal action, *United States v. Desaigoudar,* No CR–97–294–VRW.

30 Subsequently, the court sentenced Desaigoudar to a custodial sentence of thirty-six months, a three year period of supervised release, a $100,000 criminal fine and restitution requiring the transfer of all of Desaigoudar's remaining 1,518,220 shares of CMD to a custodian for plaintiff shareholders in the related securities class action suits brought against CMD, its directors and outside auditors. Cf *In re California Micro Devices Sec. Lit.,* 965 F.Supp. 1327 (N.D.Cal.1997).

31 Desaigoudar's criminal conviction, however, was reversed by the Ninth Circuit and remanded for another trial. See CR–97–294: Doc # 244.

32 On May 14, 2002, Desaigoudar pled guilty to a single count of insider trading in violation of 15 USC §§ 78j(b) and 78ff. See Plea Agrmt (CR–97–294: Doc # 324).

33 On August 23, 2003, the court sentenced Desaigoudar to a custodial sentence of 30 months, a period of supervised release of three years and ordered him to pay a criminal fine of $60,000 and $572,996.66 in restitution. See CR–97–294: Doc # 352.

34 The SEC commenced the instant proceedings on September 30, 1998, against Desaigoudar and Henke. See Doc # 1.

35 Default was entered against Henke on April 3, 2003. See Doc # 52.

36 By this action, the SEC seeks civil penalties in part to recover additional funds for distribution to investors harmed by CMD's inflated share price from May 4, 1994, through January 6, 1995. May 4, 1994, represents the day after CMD reported its results for the third fiscal quarter, while January 6, 1995, represents the day on which Coopers & Lybrand resigned as CMD's outside auditors.

37 On November 18, 2002, the court entered the parties' stipulation and order concerning the issues to be tried. In particular, the SEC and Desigoudar stipulated that in the event of a trial:

1 The trial would be limited to the issue of monetary relief in the form of interest and penalties, if any, to be imposed;

2 Desaigoudar would admit liability under the second cause of action, pertaining to insider trading;

3 Desaigoudar would admit liability under the third, fourth and fifth causes of action relating to controlling person liability for CAMD's false periodic reports, false books and records and failure to maintain adequate accounting controls, given his position as chief executive officer and chairman of the board of CAMD at the time in question;

4 Without admitting or denying the substantive allegations of the first and sixth causes of action, relating to false statements in CAMD's reports and a false statement to CAMD's auditors, Desaigoudar agreed that the court could consider the allegations contained in those causes of action should it determine, following trial, to impose a civil penalty;

5 A permanent injunction and officer and director bar would be entered against Desaigoudar; and

6 The parties reserved the right to present evidence and to argue all of their respective claims and defenses on the issue of monetary relief. 11/18/02 Stip and Order (Doc # 84).

38 Shortly after allegations of corporate wrongdoing came to light, share-

holders brought several class actions against CMD, its officers and outside auditors for securities fraud. See generally *In re California Micro Devices Securities Lit.*, 965 F.Supp. 1327 (N.D.Cal.1997).

39 In the settlement agreement reached in the class action, Desaigoudar transferred over 1,018,220 shares of CMD stock to the class for distribution. At the time of transfer, the value of this stock was approximately $7,123,500, but by the time the settlement proceeds were distributed, the value of the settlement had declined to $5,478,000.

40 In addition to Desaigoudar's stock transfer, members of the class have recovered approximately $13 million from CMD, $4 million from Coopers & Lybrand, CMD's accounting firm during the time in question, $2 million from CMD's director and officers insurance carrier and $573,000 in criminal restitution paid by Desaigoudar, resulting in a total recovery of approximately $25.1 million. Cf *In re Calif. Micro Devices Securities Lit.*, 965 F.Supp. 1327 (N.D.Cal.1997).

41 Because the SEC's calculated loss period in this action is shorter than the loss period claimed by the plaintiff class in the related class action, the SEC estimates that recovery for the loss period in question amounts to $21.4 million (87.4% of total), not including Desaigoudar's criminal restitution. Adding the pro-rated portion of Desaigoudar's criminal restitution payment for the SEC's loss period yields a total of $21.9 million.

42 Based on claims actually submitted by members of the class, claimed losses for the period in question totaled $24.5 million, resulting in an unrecovered loss of $2.6 million.

43 The SEC contends that the damage figure based on submitted claims from the class fails to include (1) an estimated $8,526,337 in losses for unidentified institutional investors who did not submit claims in the class action; (2) an estimated $6,245,663 in losses for unidentified shareholders based on calculating the number of shares that could have been purchased in, and were retained through the end of, the loss period and (3) an estimated $2,674,610 in unrecovered losses incurred by Hitachi Metals Ltd in its purchase of CMD stock as part of a strategic alliance agreement.

44 At trial, Desaigoudar owned approximately 500,000 shares of CMD stock, which was worth approximately $2 to $2.5 million based on recent trading prices. He and his wife currently own a home in Watsonville, California, that does not have any mortgages against it. Recently, they sold a residence in Los Gatos for approximately $2,080,000, which, after accounting for a commission fee and estimated capital gains taxes, yielded $1,800,000. Desaigoudar also possesses a retirement account worth approximately $1.3 million.

45 Excluding the value of his unencumbered home in Watsonville, Desaigoudar's major assets totaled $5.1 to $5.6 million at the time of trial.

46 Since the time of trial, however, CMD stock has dropped significantly in value. For the past six weeks, CMD stock has traded in a range of $2.25 to $2.50. At a recent share price of $2.35, Desaigoudar's CMD stock is now worth approximately $1,175,000, which represents an approximate drop of 50% from the SEC's earlier calculations.

47 Thus, taking into account the recent drop in CMD stock, Desaigoudar's assets total approximately $4.2 million.

This figure does not account for any post-trial variation in Desaigoudar's retirement account or in the value of any investments funded with proceeds from the sale of his Los Gatos residence.

48 In total, investors have recovered over $6,056,000 in claimed losses from Desaigoudar's assets.

49 To the extent that any of these findings of fact should more properly be characterized as conclusions of law, they shall be deemed as such.

## II  CONCLUSIONS OF LAW

■ 1 Pursuant to the parties' stipulation, Desaigoudar admits liability under the second through fifth causes of action, for insider trading and failure to comply with SEC regulations as a controlling executive.  See 11/18/02 Stip and Order.

2 Because the court determines that a civil penalty for the claims on which Desaigoudar has admitted liability is appropriate, the court considers the allegations of the first and sixth causes of action to arrive at an appropriate penalty.

3 The court first considers the SEC's request for disgorgement of the full value of losses avoided by Desaigoudar's insider trade on April 30, 1994 (to be fully offset by the amount in criminal restitution already paid), plus prejudgment interest from the time of the inside sale.

4 "The district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of securities laws." *SEC v. First Pacific Bancorp,* 142 F.3d 1186, 1191 (9th Cir.1998) (internal citations omitted).

5 "Disgorgement is designed to deprive the wrongdoer of unjust enrichment, and to deter others from violating securities law by making violations unprofitable."  *Id.* (internal citations omitted).

6 The district court is "not required to trace every dollar * * *."  Id at 1192 n. 6.  The amount of disgorgement need only be "a reasonable approximation of profits causally connected to the violation."  *Id.*

7 Disgorgement is not limited to particular assets or funds traced to the unlawful conduct.  "To hold * * * that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results" that might unjustly enrich a defendant who was "careful to spend all of the proceeds of his fraudulent scheme."  *SEC v. Banner Fund Int'l,* 211 F.3d 602, 617 (D.C.Cir.2000).  Hence, "an order to disgorge establishes a personal liability which the defendant must satisfy regardless whether he retains the selfsame proceeds of his wrongdoing."  *Id.*

■ 8 Whether prejudgment interest should be awarded is a "question of fairness, lying with the [trial] court's sound discretion, to be answered by balancing the equities." *Knapp v. Ernst & Whitney,* 90 F.3d 1431, 1441 (9th Cir.1996) (quoting *Wessel v. Buhler,* 437 F.2d 279, 284 (9th Cir.1971)).  The court should "consider a number of factors, including whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental conditions of fairness."  *Osterneck v. Ernst & Whitney,* 489 U.S. 169, 176, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989).

"[P]rejudgment interest serves a compensatory function, designed to make the injured party whole." *Knapp*, 90 F.3d at 1441.

10   In this case, Desaigoudar does not contend that the SEC delayed in bringing or prosecuting the action. Instead, Desaigoudar questions the fairness of imposing additional penalties in light of the payments already made by Desaigoudar.

11   Insofar as prejudgment interest represents the time value of the ill-gotten gains, the court finds that a restitutionary award of prejudgment interest is appropriate. The undisputed calculation of prejudgment interest based on an avoided loss of $572,996.66 from the date of the inside trade until the date of Desaigoudar's payment is $308,428.

12   The court exercises "broad discretion in determining the disposition of the disgorged funds." *First Pacific Bancorp*, 142 F.3d at 1192. Moreover, "it is normally within the district court's discretion to order that disgorged funds be used to compensate securities fraud victims * * *." *Id.* (quoting *SEC v. Fischbach Corp.*, 133 F.3d 170, 176 (2d Cir.1997)).

13   Accordingly, the court ORDERS Desaigoudar to pay, in addition to the $572,996.66 in criminal restitution already paid for losses avoided by his insider trade, $308,428 in prejudgment interest, to be distributed to the class in the related securities fraud class action.

14   The court next considers the propriety of penalty under the Insider Trading Sanctions Act, 98 Stat 1264, codified at 15 USC § 78u–1(a)(2). Under the ITSA, the court may impose a civil penalty of up to three times the profit gained or the loss avoided, as a result of the lawful securities sale "in light of the facts and circumstances." 15 USC § 78u–1(a)(2). The penalties authorized by the ITSA are intended to supplement traditional equitable remedies of disgorgement to enhance deterrence of insider trading. HR Rep No 355, 98th Cong, 1st Sess 7–8 (1983).

15   Here, an additional penalty is particularly appropriate in view of Desaigoudar's continued refusal to acknowledge the full extent of his knowledge and role in CMD's accounting fraud. Desaigoudar continues to attempt to avoid acceptance of full responsibility by claiming that he was not aware of CMD's unlawful accounting practices at the time the company issued false and misleading statements to investors.

16   A penalty pursuant to the ITSA is also appropriate in light of Desaigoudar's position as CEO and chairman of the board and his active role in perpetrating the securities fraud.

17   The court concludes that a penalty equal to the avoided loss pursuant to the ITSA is appropriate in order to achieve the ITSA's goal of deterrence.

18   Finally, the court considers whether to impose $100,000 "Third Tier" penalties pursuant to 15 USC § 78u(d)(3)(B)(iii) for each of the five violations alleged in the first, third, fourth, fifth and sixth causes of action.

19   15 USC § 78u(d)(3)(B)(iii) provides that "the amount of penalty for each [violation of securities law] shall not exceed the greater of (I) $100,000 for a natural person * * * or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if—(aa) the violation * * * involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (bb) such violation directly or indirectly re-

sulted in substantial losses or created a significant risk of substantial losses to other persons."

20 The SEC seeks third tier penalties for each of the violations alleged under the first, third, fourth, fifth and sixth causes of action, for a total of $500,000.

21 As noted, Desaigoudar has stipulated to liability under all except the first and sixth causes of action. But he has agreed that to the extent the court determines that a civil penalty in the case is appropriate, the court may consider the allegations thereunder.

22 Even absent stipulated liability, the court concludes that Desaigoudar engaged in the violations of securities law alleged by the first and sixth causes of action. In particular, the court concludes that Desaigoudar (1) knowingly made untrue statements of material fact and omitted statements of material fact, thereby perpetrating fraud on securities traders in violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder and (2) made or caused to be made a materially false or misleading statement and omitted or caused another person to omit material facts to CMD's accountants in connection with the audit of CMD's financial statements and the preparation of reports required to be filed by CMD with the SEC in violation of Rule 13b2–2.

23 Third tier penalties may be awarded if the violations involved fraud, deceit, manipulation or a deliberate or reckless disregard of a regulatory requirement, and the violations directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. 15 USC §§ 78u(d)(3)(B)(iii)(aa)-(bb). It is undisputed that in this case, the statute authorizes $100,000 for each of the alleged securities law violations.

24 As a controlling officer, he had a duty and obligation to ensure the accuracy of CMD's public filings with the SEC. Having been informed in early 1994 of serious problems in CMD's revenue recognition and accounting practices, Desaigoudar's position that he had relied on cursory assurances from others within the company and in any event was too busy and distracted in pursuit of other business opportunities is simply unacceptable. Desaigoudar's participation in decisions to issue misleading statements to investors, CMD's outside auditors and the SEC following the close of fiscal year 1994 also weighs in favor of a substantial penalty.

25 But, as this court has noted, most recently in connection with Desaigoudar's criminal sentencing, "[m]any scholars criticize commonly used measures of damages as excessive, either because they overcompensate the plaintiff class for their actual losses or because they fail to achieve optimal deterrence of misdeeds, thereby producing a loss in market efficiency." 1/30/03 Order (CR–97–294: Doc # 370), at 12–13.

26 As the court explained:

Because the large majority of open market securities fraud cases settle before trial, several commentators have suggested that damages are even more likely to be distorted in settled cases because of a widespread assumption that the court will apply a loss-based measure of damages, which is perpetuated by the small number of securities actions that actually go to trial. * * * The * * * paucity of litigated open market securities cases

makes estimations of damages even more speculative.

Finally, the damage model commonly used in open market securities fraud litigation is rife with problems: (1) difficulty in isolating the effect of the omission or misstatement from non-fraud related influence and (2) difficulty of isolating from trading volumes the number of shares traded during the class period by investors, as opposed to specialists, market makers and others holding or trading offsetting positions in the security.

Id at 13–14.

27   Nearly $11,000,000 in "unrecovered losses" claimed by the SEC is based on losses sustained by institutional and other theoretical investors who, for unknown reasons, have not submitted loss claims even though they purchased CMD shares during, and retained them through the end of, the class period. The SEC seeks a recovery based in part on losses allegedly suffered by investors who did not submit claims. Because these investors are unidentified, any recovery purportedly made on their behalf would be distributed to investors who previously submitted claims and have already settled their securities fraud claims against CMD and Desaigoudar. This would amount to a windfall under the circumstances.

28   The SEC also seeks $2,674,610 in "unrecovered losses" incurred by Hitachi when it purchased CMD shares at an inflated price during execution of the strategic alliance agreement in 1994. Yet, Hitachi has already settled its claims against CMD in connection with its private purchase of equity. Thus, collection and distribution of a penalty on behalf of open market investors who have submitted claims would also constitute a windfall.

29   The imposition of additional civil penalty on the scale requested by the SEC primarily for the purpose of obtaining "unrecovered losses" is unpersuasive. Based on claims actually submitted, unrecovered losses total $2.6 million for the relevant loss period. Yet, as the court has remarked and discussed on previous occasions, the loss damage measure is highly problematic. Given that the class has already recovered approximately 90% of claimed losses under this likely inflated measure of damages, the need for further recovery is questionable at best and ultimately unpersuasive. A civil penalty based on the SEC's calculation of other "unrecovered losses" would result in an unjustified windfall for investors predicated on recovery for other allegedly injured parties who would not share in the additional recovery.

30   The civil penalties in question also serve deterrent purposes, however. There is no doubt that Desaigoudar's conduct is deeply troubling and inflicted great damage to CMD, its shareholders, as well as securities markets. As the SEC correctly notes, civil penalties beyond the amount required to compensate injured investors may be appropriate in order to achieve an optimal level of deterrence for a crime that is difficult to detect.

31   In this case, Desaigoudar has pled guilty to a single criminal charge of insider trading in violation of 15 USC § 78j(b) and 78ff and has paid restitution in the amount of $573,000, which represents the amount of avoided losses based on his sale of CMD stock on June 30, 1994. But the allegations of misconduct and corporate malfeasance perpetrated by Desaigoudar and others within CMD go much further than

an ill-advised and illegal security trade.

32 Based on the evidence presented, there can be little doubt that Desaigoudar was aware of and actively participated in the accounting fraud resulting in an inflated stock price. Under Desaigoudar's stewardship of CMD, the company issued several false reports to the investing public while continuing to engage in gross manipulations of its accounting books. Even after the close of the fiscal year, CMD issued a press release in August 1994 that attempted to hide the company's problems and further mislead investors concerning its financial health. Subsequently, Desaigoudar and others continued knowingly to conceal or recklessly disregarded the company's financial affairs by signing off on inaccurate SEC filings.

33 These constituted severe breaches of Desaigoudar's duties to the company, its shareholders and the investing public at large. The scope and gravity of Desaigoudar's malfeasance with respect to the conduct to which Desaigoudar has not stipulated liability has not been addressed by other proceedings. While the class has recovered approximately nine-tenths of its claimed losses, the civil penalties sought by the SEC may nevertheless serve as a deterrent to others who might otherwise engage in violations of securities law.

34 Accordingly, the court finds it appropriate to impose the penalties requested and ORDERS Desaigoudar to pay $100,000 for each of the violations alleged under the first, third, fourth, fifth and sixth causes of action. There is no question Desaigoudar possesses the financial means to pay these penalties. Even after imposition of these penalties, Desaigoudar will still possess the financial means to provide comfortably for himself and his family.

35 Pursuant to Section 308 of the Sarbanes–Oxley Act of 2002, Pub L No 107–204, 116 Stat 745 (2002), codified at 15 USC § 7246, the court ORDERS that the civil penalties imposed herein totaling $1,381,424.66 shall be added to and become part of the disgorgement fund for the benefit of the victims of Desaigoudar's and CMD's securities violations. 15 USC § 7246(a).

36 Section 78u(d)(2) of Title 15 of the United States Code authorizes the court to order an officer and director bar "if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer." The court also possesses the authority to order this relief based on its inherent equitable powers. *First Pacific Bancorp*, 142 F.3d at 1193. In light of the SEC's showing, the court concludes that this threshold has been met. Accordingly, pursuant to the November 18, 2002, stipulation and order, the court in its discretion ORDERS that Desaigoudar is hereby permanently and unconditionally prohibited from acting as an officer or director of any issuer required to file reports pursuant to Sections 12(b), 12(g) or 15(d) of the Securities Exchange Act of 1934.

37 To the extent that any of the foregoing conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

IT IS SO ORDERED.