**UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**and**

**Unsecured Creditors' Committee of the Church Extension of the Church of God, Inc., Intervening Plaintiffs,**

**v.**

**CHURCH EXTENSION OF THE CHURCH OF GOD, INC., United Management Services, Inc., James Perry Grubbs, and Shearon Louis Jackson, Defendants.**

No. 1:02–CV–1118–DFH–VSS.

United States District Court, S.D. Indiana, Indianapolis Division.

Dec. 15, 2005.

Steven Justin Levine, Tina K. Diamanto-poulous, U.S. Securities and Exchange Commission, Jeff Jacob Marwil, Peter Jonathon Young, Shelley Smith, Jenner & Block LLC, Kenneth A. Kroot, Jenner & Block LLP, Chicago, IL, Sue Figert Meyer, Elliott D. Levin, Sue Figert Meyer, Rubin & Levin, PC, Indianapolis, IN, for Plaintiff.

Thomas M. Knepper, Knepper & Gladney, Chicago, IL, for Defendant.

## ENTRY ON EQUITABLE RELIEF AND CIVIL PENALTIES

HAMILTON, District Judge.

The Securities and Exchange Commission filed this civil enforcement action against Church Extension of the Church of God, Inc. ("CEG"), CEG's wholly owned subsidiary United Management Services, Inc. ("UMS"), J. Perry Grubbs, and S. Louis Jackson. Grubbs had been the CEO of CEG for many years, and Jackson had been the president of UMS for several years. The SEC alleged that the defendants had committed violations of securities law by fraudulently and negligently misleading investors who purchased investment notes from CEG from approximately 1996 through April 2002.

The Church of God is a Christian denomination with its headquarters in Anderson, Indiana. CEG is a not-for-profit corporation set up by the church to help finance the construction and expansion of local churches. CEG raised money by gifts and by selling investment notes, pri-

marily to members of the Church of God. CEG then loaned money to local congregations to help them buy, build, and expand local church properties. The CEG loans to local congregations were secured by mortgages on the properties. The payments by the congregations were used to re-pay the investors.

From 1996 to 2002, CEG departed from its original focus on providing loans to local congregations. CEG began investing heavily in non-church real estate. From a financial standpoint, at least, many of these investments were disastrous for CEG. They were also carried on the books at excessive values, giving the impression that CEG was in stronger financial condition than it actually was.

From 1996 until the spring of 2002, CEG sold about $85 million in investment notes. By the end of 2001, CEG owed note holders a total of more than $80 million. By the spring of 2002, CEG was insolvent. The SEC filed this action against CEG, a wholly-owned subsidiary called United Management Services, Inc. ("UMS"), and Mr. Grubbs and Mr. Jackson. Mr. Grubbs was CEO of CEG, and Mr. Jackson was president of UMS. Under an agreement between the SEC and new CEG and UMS management, and with oversight from a court-appointed conservator and receiver, CEG has been winding up its affairs by liquidating assets to pay creditors, including note holders. At trial, the court-appointed receiver estimated the final result will probably mean losses for note holders of between $20 million and $40 million. For more details, see this court's Entry on Motion for Judgment as a Matter of Law, issued on December 12, 2005.

The case went to trial against Mr. Grubbs and Mr. Jackson. A jury found that both had acted both fraudulently and negligently in providing misleading information to investors, in violation of Section 17(a) of the Securities Act of 1933, 15

U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. After the jury's verdict, the court held a separate hearing on the issue of remedies. The SEC seeks (1) a permanent injunction, (2) an order of disgorgement, and (3) a civil monetary penalty against both defendants.

## I. *Injunctive Relief*

■ After the SEC has proved a violation of the federal securities laws, it may obtain a permanent injunction against future violations if there is a reasonable likelihood of future violations. See 15 U.S.C. §§ 77t(b) & 78u(d); *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir.1982); see also *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir.2003). In making this evaluation, the court considers the gravity of harm caused by the violation, the extent of the defendant's participation and the degree of *scienter*, whether the violations were isolated or recurring, the likelihood that a defendant's customary business activities might involve him in similar transactions again, the defendant's recognition of his culpability, and the sincerity of assurances from the defendant that he will not violate the law in the future. *Holschuh*, 694 F.2d at 144. The SEC need not prove that all of these factors point to a likelihood of future violation. See *SEC v. Tome*, 833 F.2d 1086, 1095 (2d Cir.1987); *SEC v. Jakubowski*, 1997 WL 598108, at *1 (N.D.Ill. Sept. 19, 1997), *aff'd*, 150 F.3d 675 (7th Cir.1998).

■ The degree of harm here is the factor weighing most heavily in favor of injunctions against both defendants. CEG sold approximately $85 million in notes during the relevant period, while CEG was insolvent and was misleading note buyers about its financial condition. After CEG finally collapsed, the process of liquidating

its assets began under court supervision. The record here shows that the ultimate loss to investors will likely be approximately $30 million. These defendants both played key roles in keeping CEG in business, continuing to sell notes and continuing to sink deeper and deeper into insolvency. Mr. Grubbs was the CEO of CEG. Mr. Jackson was president of UMS. Both were deeply involved in the "bargain sale" transactions that were used to give CEG a misleading appearance of solvency. Both understood the need to show positive income and net worth in financial statements so that CEG could continue to sell more notes.

The jury found that both defendants acted both fraudulently and negligently. The fraud finding was based on instructions that required a finding of at least reckless behavior. The violations that occurred here were part of a continuous pattern of raising money by misleading claims from at least 1996 through April 2002.

The defendants have left employment with CEG and UMS, respectively. Both have continued to pursue additional business and ministries, and will continue to do so in the future. Both have assured the court they will never be involved in raising money again, except by seeking charitable contributions. The defendants both continue to deny violating the securities laws, and both contend they tried honestly and diligently to serve God and their church. Both recognize the tremendous losses suffered by the church members who invested in CEG notes, as well as the consequent harm to the church, its reputation, and especially its missions and ministries.

The *Holschuh* factors do not all point in the direction of injunctive relief, but on balance the court finds that both defendants should be permanently enjoined from future violations of Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, and SEC Rule 10b–5, and from future service as officers or directors of any issuer of securities registered pursuant to 15 U.S.C. § 78*l* or of any broker-dealer required to file reports pursuant to 15 U.S.C. § 78o(d). The defendants were substantially and vitally involved in recurring securities law violations that have inflicted losses of approximately $30 million on investors who trusted the leadership of their church and its financial arm. Injunctive relief would also streamline future enforcement efforts in the event either defendant is tempted to help raise money from investors in the future.

## II. ˙ *Financial Remedies*

The SEC also seeks the equitable remedy of disgorgement, and it proposes that each defendant's base salary before taxes for 2001, plus interest, would be equitable. The SEC also seeks third tier civil penalties of $120,000 against each defendant.

The court has already described the harm inflicted by the defendants. The total loss of approximately $30 million is substantial. The total also masks the degree of harm felt by individual investors and their families. At least some of the victims chose to invest a substantial portion of their assets and savings with CEG. Their money has been tied up in litigation for several years. They ultimately will lose a substantial fraction of their savings.

At the same time, there are several important mitigating factors that distinguish this case from typical securities fraud cases. Neither defendant was motivated by a desire for personal financial gain. Both are frugal. Neither is greedy. Neither used the note sales for his own enrichment. Both defendants worked for relatively modest compensation. Both turned down offered raises, and both have been generous in their own gifts to support CEG and the Church of God and its

ministries more generally. Both appear to be deeply and sincerely devoted to the Church of God. The court believes that the defendants lost sight of their obligations to note buyers and acted wrongfully to keep CEG afloat because they believed CEG was carrying out important missions for God and the church they served. That motive does not excuse the violations or minimize the investors' losses, but it is still an important mitigating factor.

### A. Disgorgement

■ Disgorgement of illegal profits and unjust enrichment is an equitable remedy available under the federal securities laws. *E.g., SEC v. First City Financial Corp.*, 890 F.2d 1215, 1230 (D.C.Cir.1989). The court concludes that each defendant should be ordered to disgorge one half of his base salary for 2001, plus interest, as proceeds from the securities law violations. That was the last full year of CEG's operations and of these defendants' employment. But for the securities violations, CEG would have collapsed earlier, so the violations enabled the defendants to continue their employment. There is no magic to the fraction of one-half, but it is intended to reflect in an equitable way the fact that both defendants also provided real and valuable services to CEG and the Church of God for many years, as well as other mitigating factors. See generally *SEC v. Drexel Burnham Lambert, Inc.*, 956 F.Supp. 503, 505–06 (S.D.N.Y.1997) (ordering disgorgement of salaries obtained by securities violations), *aff'd sub nom. SEC v. Fischbach Corp.*, 133 F.3d 170 (2d Cir. 1997); *SEC v. Drexel Burnham Lambert Inc.*, 837 F.Supp. 587, 612 (S.D.N.Y.1993) (amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation"), *aff'd sub*

*nom. SEC v. Posner*, 16 F.3d 520 (2d Cir.1994). The court will order Mr. Grubbs to disgorge $44,500, plus simple interest at 6% per year from December 31, 2001. The court will order Mr. Jackson to disgorge $37,000, plus simple interest at 6% per year from December 31, 2001.[1]

### B. Civil Penalties

Federal securities law also provides for civil monetary penalties, which are set in three tiers. The third and highest tier applies where the violation both "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C) and § 78u(d)(3)(B)(iii). After adjustment for inflation, the maximum civil penalty is $120,000 per violation for a human being for violations occurring after February 2, 2001. See 17 C.F.R. § 201.1002 and Table II to Subpart E.

The defendants' conduct here satisfies the criteria for third tier civil penalties. As noted, the jury found that both defendants acted with fraudulent intent, and their conduct resulted in losses of approximately $30 million.

■ In deciding what the penalties should be, the court should consider the seriousness of the violations, the defendant's intent, whether the violations were isolated or recurring, whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities. *E.g., SEC v. Cavanagh*, 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004); *SEC v. Custable*,

---

**1.** The rate of 6 percent is based on Indiana Code § 34–51–4–9 and relatively low market rates since 2001.

1996 WL 745372, at *4 (N.D.Ill.Dec.26, 1996), *aff'd*, 132 F.3d 36 (7th Cir.1997); *Jakubowski*, 1997 WL 598108, at *3. In deciding the amount of a civil penalty, the court may also take into account other sanctions the defendant faces, whether criminal or civil. *E.g., SEC v. Shah*, 1993 WL 288285, at *6 n. 5 (S.D.N.Y. July 28, 1993) (assessing no civil penalty where defendant served time in prison, paid criminal fine, performed community service, and was barred from prior industry).

In this case, the jury made a general finding as to each defendant for both fraud and negligence. The evidence was sufficient to support findings of multiple violations by each defendant, at least one for each Offering Circular from 1996 through the April 2002 supplement. Thus, the court could impose civil penalties on each defendant as much as four to seven times the statutory cap. *E.g., SEC v. Henke*, 275 F.Supp.2d 1075, 1086 (N.D.Cal.2003) (ordering defendant to pay a $100,000 penalty for each of five securities law violations), *aff'd*, 130 Fed.Appx. 173 (9th Cir. 2005).

The court has already addressed most of the relevant factors, both aggravating and mitigating. Mr. Grubbs and Mr. Jackson do not face criminal penalties, though they face private civil litigation by CEG and note holders. Also, CEG has refused to give these defendants access to at least some of their own retirement funds and other assets by way of set-offs for claims of CEG and its note holders.

To the extent ability to pay is relevant, Mr. Grubbs and his wife had a net worth of approximately $900,000 in April 2004, though that figure has certainly declined since then. Mr. Jackson and his wife had a net worth of approximately $248,000 at that time, and that figure has also declined since then. Neither defendant has substantial earned or investment income at this time. The record does not show individual assets, as distinct from joint assets.[2]

■■ Upon weighing the aggravating and mitigating factors, the court concludes that Mr. Grubbs should pay a civil penalty of $120,000, and Mr. Jackson should pay a civil penalty of $90,000. The penalty for Mr. Grubbs is the maximum for one violation, but the evidence here supports multiple violations. A single maximum penalty is appropriate in light of the mitigating factors. The penalty on Mr. Jackson is lower to account for Mr. Grubbs' greater responsibility and the fact that the SEC's "use of proceeds" theory applied only to Mr. Grubbs. In Mr. Jackson's case, the evidence also supports multiple violations and multiple penalties. A single penalty against Mr. Jackson for 75% of the maximum accounts for the mitigating factors and the defendants' respective roles in the violations.

## Conclusion

Accordingly, the court will enter separate final judgments against Mr. Grubbs and Mr. Jackson permanently enjoining both from future securities law violations and from future violations of federal securities laws and from service as officers or directors of issuers of federally registered

---

2. The SEC's remedy brief referred to the SEC's settlement practices and implied the court should impose civil penalties above the typical settlements. Defendants responded with a description of the unsuccessful settlement negotiations in this case. The court disregards both sides' points concerning settlement. Under Rule 408 of the Federal Rules of Evidence, evidence of settlement negotiations in this case is not admissible for these purposes. Basing judicial decisions on the SEC's settlement practices puts the cart before the horse. If courts were to start basing their remedial decisions on a party's settlement practices, the practical effect would be a delegation of the court's responsibility to that party.

securities and federally regulated broker-dealers, ordering disgorgement of $44,500 plus interest by Mr. Grubbs and $37,000 plus interest by Mr. Jackson, and imposing third tier civil penalties of $120,000 on Mr. Grubbs and $90,000 on Mr. Jackson. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the court finds that there is no just reason to delay entry of final judgment on the SEC's claims against these defendants, while other aspects of this case and related litigation proceed.

So ordered.